**Barton E. CROLL, Executor of the Estate of Verna V. Croll, deceased**

v.

**UNITED STATES of America.**

**Civ. A. No. 80–4489.**

United States District Court,
E.D. Pennsylvania.

Aug. 28, 1984.

Bradley D. Miller, Reading, Pa., Clifford Shoemaker, Vienna, Va., for plaintiff.

Joseph Masiuk, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

**MEMORANDUM, INCLUDING FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER**

TROUTMAN, Senior District Judge.

## I.

### INTRODUCTION

This civil action was originally filed on November 20, 1980, under the Federal Tort Claims Act, 28 U.S.C. § 1346(b) and § 2671 *et seq.*, as incorporated by the National Swine Flu Immunization Program. Act of 1976, 42 U.S.C. § 247(b). As required by 28 U.S.C. § 2402, the case has been submitted to the Court for trial without a jury.

Historically, the case was transferred to the Judicial Panel on Multidistrict Litigation for coordinated and consolidated pretrial proceedings and has now been remanded to this Court for further proceedings and trial. Under the Final Pre-trial Order of the transferee court, where, as here, the United States concedes that the decedent contracted Guillain-Barre Syndrome (GBS) after receiving a Swine Flue vaccination, the only issue to be decided is one of causal relationship between the Swine Flue vaccination and the GBS. No theory of liability need be established by the plaintiff to recover damages. Thus, the plaintiff need not prove negligence or other fault to recover damages.

By agreement of counsel and with the approval of the Court testimony was taken and evidence submitted on the causation issue only. If the plaintiff prevails testimony will then be taken on the issue of damages.

## II.

### DISCUSSION

The first witness called by the plaintiff was Barton E. Croll, a son of the decedent, who testified as to the decedent's date of birth, date of marriage, community activities, religious activities, etc. He testified that she received the inoculation on October 8, 1976, at the age of 67 years, that she later complained of tingling of the hands,

weakness and headaches. These symptoms *first* appear in the medical records when the decedent was admitted to the St. Joseph's Hospital on February 20, 1977, and complained of weakness and numbness of the fingers and toes, commencing February 18, 1977. The nurses' notes suggest a history of head pains commencing February 15, 1977. Importantly, the testimony of the son was expressly *not* offered to prove post-vaccination symptoms or complaints, but for historical purposes only. He testified as to the decedent's hospitalization from January 18, to January 27, 1977, the implantation of radium for cancer of the uterus, the existence of high blood pressure over the years, the occurrence of phlebitis and other conditions.

The plaintiff's decedent was diagnosed, with a reasonable degree of medical certainty, as having GBS and the defendant so concedes. Although the exact cause of GBS is unknown, epidemiological studies have established a causal relationship between the Swine Flue vaccine and GBS. GBS is also known to occur in persons who have never received the Swine Flue vaccine. Thus, plaintiff's burden on the issue of causation was to establish, through epidemiological evidence and other evidence, that the GBS from which decedent suffered and which manifested itself seventeen to nineteen weeks after she received the Swine Flue vaccination was more probably or more likely than not caused by the vaccination.

The basic data employed by both the plaintiff's and defendant's experts was data gathered by the Center for Disease Control (CDC) at the time of the Swine Flue immunization program in 1976 and thereafter. The program, which began on October 1, 1976, was terminated on December 16, 1976, due to concern about a disproportionate incidence of GBS in those who received vaccinations. Major studies by the CDC followed. As a result of CDC studies, the Government agreed and stipulated to liability in those cases whose GBS occurred within ten weeks of the Swine Flue inoculation. However, the plaintiff's medical expert, Dr. Goldfield, takes sincere-

and outspoken exception to the methods followed by Dr. Schonberger and others who participated in the CDC program. He ultimately obtained access to the CDC data base and made his own studies and findings. In response, the Government commissioned a panel of experts, including Dr. Nathanson, also a witness in this case, called by the defendant, to reevaluate the CDC data and studies. The differences in result involve the evaluation of data, the completeness and accuracy of that data, including the reporting or under-reporting of GBS cases with regard to the triggering event, varying degrees of under-reporting as between vaccinated and unvaccinated cases, as between early-onset cases and late-onset cases, as between mild and severe cases, as between various geographical areas and other factors, such as the effect of the termination of the program, possible confusion of GBS with other neurological disorders and other considerations. These problems and resultant considerations lead directly to the talents and expertise of an epidemiologist whose function is to develop, from available data, the most accurate comparison of GBS rates in vaccinated and unvaccinated populations, giving due consideration to other medical information and other disciplines. As stated, against this background, the plaintiff called Dr. Goldfield and the defendant called Dr. Nathanson, both experts in the field of epidemiology.

The defendant also called Dr. Elliott Mancall, a neurologist, who detailed his findings as a result of a complete review of the decedent's medical history and records. Upon a finding that the decedent, a known hypertensive and diabetic at the time of her vaccination on October 8, 1976, did indeed suffer GBS, that significant neurological symptoms thereof did not develop until February 18, 1977, approximately nineteen weeks following inoculation, he concluded that there was, in his opinion, no causal relationship between the immunization and the GBS. He based his opinion upon the absence of neurological abnormalities during said period of time and attributed the

GBS to a "D & C followed by implantation of radium for treatment of carcinoma of the uterus" on January 19, 1977, pointing out that GBS "is sometimes encountered after non-specific and often minor surgical procedures" such as were here performed one month prior to the development of the symptoms.

Then followed the videotaped deposition of Dr. Neal Nathanson who concluded with "a reasonable degree of medical epidemiological certainty" that there was no causal relationship between the immunization and the development of GBS. He described the panel upon which he served which included Dr. Langmuir, an epidemiologist, Dr. Kurland, an epidemiologist, Dr. Victor, a neurologist, and Mr. Bregman, a statistician and computer expert. Assuming the development of GBS seventeen to nineteen weeks following the vaccination, he too concluded with a "reasonable degree of medical and scientific certainty" and as an expression of an "epidemiologic opinion" that the GBS from which decedent suffered "was not casually associated with the prior administration of swine flue vaccine". He expressed this opinion with "a reasonable degree of epidemiological certainty". Like the plaintiff's witness, Dr. Goldfield, he went to the blackboard to illustrate the bases for his opinion.

We are thus faced with a substantial and sometimes a verbally "violent" difference of opinion as between Dr. Goldfield and Dr. Nathansom. The record reveals that there is room for responsible epidemiologists to differ not only in their conclusions and opinions but also in assumptions and choices required in arriving at a conclusion and opinion as to causal relationship. This fact has led to the use of unusually strong terms, particularly on cross-examination, such as "bias", "prejudice", "artifact" etc.

In weighing and considering the conflicting opinions and conclusions of Dr. Goldfield and Dr. Nathanson, both qualified, we face a difficult task. In weighing Dr. Goldfield's testimony we note that he has tended to be very selective in choosing his alternatives and in the selection of figures, statistics and assumptions upon which to base a conclusion. He has accused those who differ in their conclusions with bias when, however, his own testimony clearly demonstrates that such selections of alternatives is one of wide choice on which epidemiologists may reasonably and honestly differ. However, even his testimony, however strongly and emphatically stated, does not establish that his choices or assumptions were the only logical or reasonable assumptions or choices which a qualified epidemiologist could or would make under the circumstances.

On the contrary, Dr. Nathanson was far less definitive and arbitrary in defending his choice of alternatives, conceding always the existence of reasonable grounds for other choices and assumptions but logically defending the choices selected by him. Additionally, his opinions and conclusions are supported by other epidemiologists, including Dr. Langmuir and Dr. Kurland. His conclusions are also supported by Dr. Victor, a neurologist. It is argued that Dr. Nathanson's conclusion enjoys more biological support than that of Dr. Goldfield. We do not disagree. After considerable study and reflection, we do accept the opinion of Dr. Nathanson as opposed to that of Dr. Goldfield.

Finally, there is of record the testimony of Dr. Mark Jeffrey Brown, an impartial expert appointed by the Court. Dr. Brown specializes in the field of neurology and has outstanding qualifications. A mere reference to his curriculum vitae discloses exceptional accomplishments in his speciality. Importantly, he was retained by neither party. Rather he was appointed to express an impartial opinion to aid the Court in determining the issue involved. After studying and examining all relevant and pertinent data concerning the decedent's medical condition, including hospital records, histories, medical tests and studies, examinations and the results thereof, laboratory studies and the results thereof, and autopsy findings, he concluded that the decedent's death on March 19, 1977, was unrelated to the Swine Flu vaccination on

October 8, 1976. As one who has specialized and enjoys special and unique expertise in the diagnosis and treatment of human peripheral nerve diseases, his opinion is entitled to great weight. Moreover, his impartial approach, with allegiance, loyalty and obligation to neither party, lends additional weight to his opinion and conclusions.

Accordingly, the following constitute our findings of fact and conclusions of law, as required by F.R.C.P. 52(a).

## III.

### FINDINGS OF FACT

1. Verna V. Croll, plaintiff's decedent, received a Swine Flu vaccination on October 8, 1976.

2. Decedent was 67 years of age at the time she received her Swine Flu vaccination.

3. Previous to her vaccination, decedent had a history of hypertension of fifteen years duration and had received intermittent treatment for hypertensive vascular disease and acute phlebitis.

4. After receiving the Swine Flu vaccination, decedent made a visit to her family physician, Dr. J.P. Slovak, on December 1, 1976. Dr. Slovak measured decedent's blood pressure, pulse and respiration and continued her prescription for Lasix, a diuretic.

5. On December 1, 1976, decedent reported to Dr. Slovak that "she had vag[inal] bleeding one day", for which he referred her to a gynecologist, Dr. George Scheers.

6. On January 13, 1977, decedent made an office visit to Dr. Scheers, who did not mention the existence of any neurological signs, symptoms, or complaints in his notes of examination.

7. On January 18, 1977, decedent was admitted to St. Joseph's Hospital in Hazleton, Pennsylvania, "because of a single episode of vaginal bleeding which occurred on November 27, 1976, and lasted for only 1 day".

8. Upon physical examination on admission to St. Joseph's Hospital on January 18, 1977, it was reported with reference to decedent's musculo-skeletal system: "None contributory".

9. Decedent's nervous system was described: "No past history of paralysis or convulsion".

10. Decedent's extremities were said to be: "Normal; reflexes are physiological".

11. On January 19, 1977, decedent was taken to the operating room where a pelvic examination under anesthesis was done, a dilatation and curettage was performed and an endocervical polypectomy was completed.

12. The pathology report from the January 19, 1977, surgery confirmed an adenocarcinoma of the endometrium.

13. On January 20, 1977, it was reported that "Patient has no complaints and is ambulatory, afebrile and is doing well".

14. On January 21, 1977, decedent was returned to the operating room where she was again placed under general anesthesia and an "intra-uterine radium application" was carried out.

15. On January 23, 1977, it was reported that decedent was "Afebrile and doing well. Offers no complaints with radium in place".

16. On January 23, 1977, the radium implant was removed and decedent was discharged from St. Joseph's Hospital on January 27, 1977.

17. Nowhere in the three pages of doctor's progress notes or nine pages of nurses' notes made during decedent's hospitalization at St. Joseph's Hospital from January 18–27, 1977, is there any entry that would indicate or suggest that decedent experienced any neurological signs or symptoms during this hospitalization.

18. While in St. Joseph's Hospital, on January 25, 1977, decedent was seen in consultation by Dr. Herman Auerbach, who reported:

On system review she has burning ½ hr. after meals and uses a great deal of

Maalox. She has had no other significant past history, and no complaint of (sic) system review.

19. Dr. Auerbach made no mention in his consultation report of January 25, 1977, of decedent having experienced any neurological symptoms.

20. After her discharge from the hospital, decedent made a return visit to Dr. Slovak on February 9, 1977, during which he took her blood pressure, pulse and respiration and made a notation of "varicose veins".

21. On February 15, 1977, Dr. Slovak saw decedent again, noting "NNC" (no new complaints); and took decedent's blood pressure and pulse and made a diagnosis of "HVD" (hypertensive vascular disease) and "Veins".

22. Nowhere in Dr. Slovak's medical records for decedent's visits of February 9 or 15, 1977, is there any indication or recording that suggests decedent was experiencing neurological symptoms of any kind.

23. Dr. Slovak saw decedent again on February 18, 1977, two days prior to her hospitalization for Guillian-Barre Syndrome and reported "acute [?] action ... back pain" and suggested "Bed Rest".

24. On February 20, 1977, decedent was again admitted to St. Joseph's Hospital with a diagnosis of "Probable Polyneuritis-Landry's", which is another term for GBS.

25. Upon admission to St. Joseph's on February 20, 1977, decedent gave the following history of her present illness:

The patient is a 67 years old woman admitted to the hospital on 2/20/77 with the chief complaint of weakness of both legs. The weakness began on the 18th and gradually became more severe. She is unable to bear weight on the day of admission and has been in bed since the evening of the 19th. On the 19th she has (sic) noticed some weakness of the arms, there is definite weakness of the left arm with weakness of the left hand grip. In addition she complains of numbness of the fingers and toes. There is no dysphagia, shortness of breath, cough. The

patient had a headache on admission but this was relieved by Demerol and has not occurred (sic).

26. On February 21, 1977, a consulting physician at St. Joseph's Hospital reported:

67 Y[ear] o[ld] r[ight] handed lady admitted because legs "buckle" on her ... Noticed this first on 2/18/77 then got worse since then ... Since 2/20 numbness in hands and difficulty elevating shoulders.

27. In a "Nursing Data Base" form dated February 20, 1977, it was recorded under "reason for Hospitalization or Chief Complaint": "States legs very weak, won't support w[eigh]t. Toes and fingers numb. Pain in back of neck up to head". Under "Duration of this Problem" it was recorded: "Pain in head Tuesday. Numb and weak Friday".

28. The Tuesday immediately prior to February 20, 1977, was February 16, 1977, and the Friday immediately preceding February 20, 1977, was February 18, 1977.

29. In a nurses' note dated February 20, 1977, 1:15 a.m. it was reported: "numbness in fingers and toes since Friday 2–18–77".

30. On February 22, 1977, decedent was discharged to Reading Hospital. In her discharge summary it was recorded:

The patient is a 67 year old woman who was admitted to the hospital on 2/20/77. Chief complaint was weakness of both legs. The weakness began on the 18th and gradually became more severe. She is unable to bear weight on the day of admission and has been in bed since the evening of the 19th. On the 19th she noticed some weakness of the arms. There is definite weakness of the left arm with weakness of the fingers and toes. There is no dysphagia, shortness of breath, cough. The patient had a headache on admission but this was relieved by Demerol and has not recurred.

31. Decedent's discharge diagnosis from St. Joseph's Hospital on February 22, 1977, was:

Probable polyneuritis—Landry's?—etiology

a. Diabetes?

b. related to her ca[ncer]? .

c. idiopathic.

32. On February 22, 1977, decedent was admitted to the Reading Hospital. On admission she gave the following history: On 2/18/77, p[atien]t awoke about 0400 hours to urinate. Walked to B[ath] R[oom] [with] difficulty and went back to bed. At 0700 hours, she awoke [with] weakness in both lower extremities and was unsteady on her feet. During remainder of day weakness became gradually worse and on the next day she could not bring herself to a standing position from sitting. Went to L[ocal] M[edical] D[octor] and told B[lood] P[ressure] 215/110. She also c[omplains] o[f] this day of burning in her toes and onset of numbness in her hands. Admitted to hospital 2/20/77 at which time she also c[omplains] o[f] weakness in both arms, especially in shoulders. On admission today, she continues to have weakness of all extremities …

33. On February 22, 1977, it was noted in a consultation report: 67 y[ear] o[ld] W[hite] F[emale] [with] 4–5 day history of progressive muscular weakness and parathesias progressing from lower extr[emities] to upper extr[emities].

34. A Reading Hospital consultation report dated March 2, 1977, stated: "General weakness of fairly abrupt onset 12 d[ays] ago …"

35. A March 9, 1977, consultation report also states: "Gen[eral] weakness, severe 3½ weeks. (Onset Feb. 18)".

36. Decedent's course in Reading Hospital was described in the discharge summary: The patient was admitted to the floor for routine nursing care and evaluation of the cause of this weakness. It was noted over the next few days that the patient began feeling subjectively weaker and noticed beginning sensations of dyspnea. Consult was written for Dr. Stoudt for neurological evaluation. His impression being infectious polyneuritis and myelitis. Although because of evaluation of the Babinski reflex being made difficult the inclusion of myelitis is placed in question. Consult was also placed with Dr. Youngberg for physical therapy, an EMG was performed showing no fasciculations or fibrillations, nor abnormal motor unit action potentials. Repeated the EMG after approximately 10 days showed partial denervation response with less denervation than clinically suggested. At this time the outlook was good. The status of the patient continued to improve such that application was made for extended care facility/ However, on 3/11/77 the patient suddenly went into respiratory arrest and was thought to have aspirated. However, aspirate was TH 6. The patient was then transferred to Intensive Care Unit and consult was placed to Dr. Shuman. She was then placed on the MA1 and consult then placed to Dr. Cohn for tracheostomy. It was then noted that her temperature continued to increase with no organisms seen in the sputum. The patient was placed on Keflin, heart rate increase and from the sputum pseudomonas aeruginosa was grown. On the morning of 3/19/77 at 0845 hours the patient had sudden onset of ventricular tachycardia and house staff was. called again. At this point all resuscitated (sic) measures failed. The family was notified and permission was given for autopsy.

37. It was also recorded in the Reading Hospital discharge summary that: The patient is a 67 year old white female, somewhat obese, transferred to the Reading Hospital Medical Center from St. Joseph Hospital in Hazleton for evaluation of lower extremity weakness of unknown etiology. Four days prior to Reading Hospital Medical Center (sic) the patient awoke during the night complaining of nocturia. She then returned to bed and again at 7 o'clock awakening in the morning complained at this time of

weakness in both lower extremities. She noted then that she was unsteady on her feet. During the remainder of the day the weakness became gradually worse and on the following day 2/19/77, the patient could not bring herself to a standing position from a sitting position. Seen by her family medical doctor she was told her blood pressure was 215/110. She then began complaining of burning in her toes and numbness in her hands and began complaining then of weakness in both arms, especially noted in the shoulders.

38. According to the overwhelming weight of the medical evidence submitted in this case concerning the date of the first onset of neurological symptoms, the interval of time between the date the decedent received her Swine Flu innoculation, which was October 8, 1976, and the date of the first onset of neurological symptoms in February, 1977, was from seventeen to nineteen weeks in duration.

39. The interval of time between decedent's first onset of neurological symptoms in February, 1977, and her death on March 19, 1977, from complications relating to Guillain-Barre Syndrome was from four to six weeks in duration.

40. Guillain-Barre Syndrome is a disorder of the peripheral nervous system characterized by acute onset and rapid progression, with the majority of cases evolving in no more than four weeks.

41. Guillain-Barre Syndrome is not a disease which evolves slowly over a period of many months.

42. The cause of Guillain-Barre Syndrome is unknown; however, certain events have been known to precede and, perhaps, to precipitate it, such as various viral infections; metabolic disorders such as diabetes, and surgery.

43. Decedent, Verna Croll, was diagnosed as having diabetes; and had had surgery under anesthesia consisting of a dilatation and curettage, endocervical polypectomy and intrauterine radium application on January 19 and 21, 1977, which was after her Swine Flu innoculation on October 8, 1976, and before the onset of neurological symptoms in February, 1977.

44. According to the weight of the epidemiologic evidence presented in this case, both documentary and testimonial, any increased risk of Guillain-Barre Syndrome attributable to the Swine Flu vaccine extends for no more than ten weeks following the vaccination.

45. As noted in the most recent epidemiologic study published in the June, 1984, issue of the *American Journal of Epidemiology*, any increased risk of Guillain-Barre Syndrome attributable to the Swine Flu vaccine extends no further than eight weeks following the vaccination.

46. Since the onset of neurologic symptoms associated with decedent's Guillain-Barre Syndrome took place seventeen—nineteen weeks after her vaccination on October 8, 1976, it was well outside the eight to ten week period of increased risk attributable to the vaccine as articulated in the overwhelming weight of epidemiologic studies.

47. The epidemiological evidence presented by the defendant in this case is more credible than that presented by plaintiff.

48. Dr. Nathanson, the defendant's expert epidemiologist, who testified at trial in this case, was Editor-in-Chief of the American Journal of Epidemiology for almost twenty years.

49. The American Journal of Epidemiology is a peer-reviewed journal which publishes scholarly papers in the field of epidemiology on an international basis.

50. The American Journal of Epidemiology is acknowledged as an authoritative publication in the medical community.

51. Dr. Nathanson is also a member of the American Epidemiological Society, which is a group of senior epidemiologists with a limited number of members to which one is elected by invitation only.

52. The discipline of epidemiology as heretofore suggested is concerned with describing the occurrence of diseases, both

infectious and noninfectious, by examining populations, in contrast to clinical medicine, which examines the occurrence of diseases on a case-by-case basis.

53. Prior to his testimony in *Croll*, Dr. Nathanson has been previously involved in matters pertaining to Swine Flu litigation, by serving as a member of a panel commissioned to perform a reexamination of data surrounding those individuals who developed Guillain-Barre Syndrome following the administration of Swine Flu vaccine (hereinafter referred to as the panel) and by testifying as an expert witness in a number of other cases.

54. The panel, heretofore discussed, on which Dr. Nathanson served was formed in the spring of 1982 and was comprised of Dr. Alex Langmuir, who was a senior epidemiologist and former head of epidemiology at the Center for Disease Control and also had been a professor of epidemiology at Harvard Medical School; Dr. Leonard Kurland, who is a professor and the chairman of the Epidemiology Department at the Mayo Medical School in Rochester, Minnesota; Dr. Maurice Victor, who is a professor of neurology and Chairman of the Neurology Department at Case Western Reserve University at the Metropolitan General Hospital in Cleveland; and Mr. Dennis Bregman, a statistician and computer expert, who was on educational leave from the Harvard School of Public Health, but who is a long term employee at the Center for Disease Control as a statistician and computer expert.

55. Each of the members of the panel enjoy outstanding reputations in their respective scientific disciplines.

56. The work of the panel, heretofore discussed, was organized as follows: Mr. Bregman worked with the coded computer tape from CDC which formed the data base for the analysis; Dr. Victor advised the panel as a clinical neurologist on classifying the cases in the data base to be examined and on articulating the minimum data required for accepting a diagnosis of Guillain-Barre Syndrome for inclusion in the study; and Drs. Langmuir, Kurland and

Nathanson, the epidemiologists on the panel devised an analysis of the data into a series of tables and figures and drew conclusions and inference from those analyses.

57. The panel's interdisciplinary approach to the problems created by the imperfect data base available to it appears to reflect sound scientific judgment.

58. The results of the panel's work of which Dr. Nathanson was a member, have been published in the American Journal of Epidemiology.

59. The process for publication in the American Journal of Epidemiology is as follows: the article is submitted to the Editor-in-Chief, who then assigns the article to an editor. The editor then sends the article to at least two highly qualified referees, who offer their comments on the article. After changes are made to the article as the result of the referees' comments, the article is submitted for publication.

60. Other epidemiologic studies in addition to the panel study have been published in the American Journal of Epidemiology. The study of Dr. Lawrence Schonberger of CDC, which concludes that the period of increased risk of GBS associated with the vaccine lasts for no more than ten weeks; and the Michigan Study, which concludes that the increased risk associated with the vaccine lasts only six weeks.

61. There have been no published epidemiologic studies which extend the period of increased risk of GBS associated with the vaccine out to seventeen weeks, which is the minimum period of time between decedent's Swine Flu shot and the onset of her neurologic symptoms.

62. Dr. Nathanson's opinion, based upon a reasonable degree of medical, scientific, and epidemiologic certainty, that Verna Croll's Swine Flu shot was not causally related to her GBS, is accepted by this Court.

63. Dr. Nathanson's opinion, based upon a reasonable degree of medical, scientific and epidemiologic certainty, that there is no clear evidence of any risk of GBS

from the vaccine *after eight weeks*, is also accepted by this Court.

64. The panel's analysis of the relevant data base reveals that the incidence of GBS after the vaccine follows a standard epidemiologic curve, with a sharp increase in the incidence of the disease during the first two weeks and a more gradual tapering off of the incidence rate through subsequent weeks until the rate reaches a plateau, which may also be termed the natural or baseline rate, which represents the rate for unvaccinated GBS which occurs naturally in the population.

65. According to the panel's analysis, which is accepted by this Court, the epidemiologic curve of the incidence of GBS associated with the Swine Flu vaccine achieved its plateau or baseline at the end of the eighth week.

66. The baseline rates which the panel used to compare to the plateau rate ascertained from the data base were obtained from the Michigan Study, and a study made over forty years in Olmstead County, Minnesota, by the Mayo Clinic.

67. As the result of an order issued by the Honorable Gerhard Gesell of the United States District Court for the District of Columbia, data became available from the CDC consisting of computer printouts of 1098 cases reported to be GBS.

68. The panel preliminary excluded some cases out of the original 1098 cases for various reasons, thus leaving a data basis of 944 cases for further analysis.

69. The process by which some cases were excluded from the analysis appears to represent reasonable and sound scientific judgment although the issue is arguable.

70. Although the panel's study grouped, for purposes of analysis, the GBS cases in the data base by categories of extent of motor involvement, Dr. Nathanson performed his own analysis of the data base without classifying the cases according to extent of motor involvement.

71. The conclusions of Dr. Nathanson's personal analysis are no different from those reached by the panel, i.e., that the risk of GBS following the Swine Flu vaccine ends at the conclusion of eight weeks.

72. The task of the panel in analyzing the data had been complicated by the fact that a moratorium on the Swine Flu immunization program had taken place on or about December 16, 1976.

73. After the December 16, 1976, moratorium on the Swine Flu immunization program, there was a drop in the rate of reporting of GBS cases in those individuals who had not received the Swine Flu vaccine.

74. To analyze the question of whether there was also a drop in the rate of reporting of GBS cases in those individuals who *had* received the Swine Flu vaccine, the panel performed an additional analysis of the data, known as a cohort analysis.

75. A cohort is defined as a group of people all of whom are grouped in a particular time fashion.

76. The panel grouped the vaccinated GBS cases into three cohorts: the Early Cohort (those individuals vaccinated from October 1–31) whose disease incidence could be observed completely for thirteen weeks and partially for an additional four and four-tenths weeks, which is the entire seventeen and four-tenths weeks of the study from October 1, 1976, to January 31, 1977; the Middle Cohort (those individuals vaccinated from November 1–21) whose disease incidence could be observed completely for ten weeks and partially for four additional weeks; and the Late Cohort (those individuals vaccinated from November 22–December 16) whose disease incidence could be observed completely for six weeks and partially for an additional four and three-tenths weeks.

77. The epidemiologic curves for each of the three cohorts (Early, Middle and Late) are similar, in that each of the curves peak at a rate of between two to two and five-tenths cases per million person weeks during the first two weeks after the administration of the vaccine, and each of the curves show that the bulk of the cases of

GBS following the vaccine occurred in the first six to eight weeks.

78. The data analysis performed by the panel is credible and is accepted and relied upon by the Court as opposed to contrary evidence submitted.

79. As previously stated, the testimony of Dr. Mark Brown, a neurologist who was appointed by the Court to serve as an impartial expert witness, that, to a reasonable medical certainty, Verna Croll's GBS was not related "in any way" to the Swine Flu vaccine, is also accepted by this Court.

80. As previously stated, this Court also accepts the testimony of Dr. Elliott Mancall, Chairman of the Department of Neurology at Hahnemann Medical College of Philadelphia, that it is more likely that a surgical procedure, consisting of a dilatation and curettage followed by an implantation of radium for treatment of carcinoma of the uterus, which Verna Croll underwent on or about January 19, 1977, was casually related to her Guillain-Barre Syndrome, the symptoms of which first developed one month later.

## IV.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this controversy and over the parties.

2. The plaintiff having failed to carry his burden of persuasion on the issue of causation, judgment will be entered for the defendant.